UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

SEAN HOWELL,
    Plaintiff,

v.

JOHN WALRATH, et al.,
    Defendants.

1:20-cv-1193-MSN-JFA

MEMORANDUM OPINION

Before the Court are two motions to dismiss filed by defendants John Walrath ("Walrath"), Thomas Meyer ("Meyer"), Ross Maurice ("Maurice"), and D. Watford ("Watford") (collectively "defendants") in this civil rights action initiated by Virginia state prisoner Sean Howell ("plaintiff"). [Dkt. Nos. 21-22, 34-35].[1] Broadly, the complaint alleges that Walrath, the "Lead Warden" of State Farm Enterprise Unit ("SFEU"); Meyer, the Warden of Operations; Maurice, the Assistant Warden; and Watford, a Unit Manager at SFEU, violated plaintiff's constitutional rights through their inadequate response to the COVID-19 pandemic. [Dkt. No. 1]. Defendants assert that the complaint lacks sufficient factual allegations to support a viable claim for relief. [Dkt. Nos. 22, 35].

Also before the Court is a motion through which plaintiff seeks an order directing defendants to answer and return interrogatories he has propounded upon them. [Dkt. No. 39]. For

---

[1] Because Watford was not served at the same time as the other three defendants, counsel initially filed a Motion to Dismiss to which Watford was not a party. [See Dkt. No. 21]. Plaintiff filed a timely opposition to that initial motion. [Dkt. No. 25]. Upon Watford's successful service, counsel filed an additional Motion to Dismiss on Watford's behalf. [See Dkt. No. 34]. Plaintiff has now also filed a response to that Motion. [Dkt. No. 38]. Because both Motions to Dismiss seek dismissal of the complaint for nearly identical reasons, they will be assessed together in this single Memorandum Opinion.

the reasons explained below, plaintiff's motion for discovery will be denied, and defendants' motions to dismiss will be granted.

**I.    Motion for Discovery**

Before assessing defendants' motions to dismiss, the Court will consider plaintiff's motion for discovery, as plaintiff suggests that the information he seeks through the interrogatories he has propounded is "necessary to adequately defend against the defendants' motion to dismiss." [Dkt. No. 41] at 2. Defendants oppose plaintiff's motion, arguing that the complaint fails to state a viable claim and that a plaintiff "is not entitled to discovery" "where a complaint is deficient because it fails to state a Section 1983 claim of relief against a government official." [Dkt. No. 40] at 1 (quoting Ashcroft v. Iqbal, 556 U.S. 662, 686 (2009)).

The Court agrees with defendants. As the Eighth Circuit has explained, "[d]iscovery should follow the filing of a well-pleaded complaint. It is not a device to enable a plaintiff to make a case when his complaint has failed to state a claim." Kaylor v. Fields, 661 F.2d 1177, 1184 (8th Cir. 1981); see also Chudasama v. Mazda Motor Corp., 123 F.3d 1353, 1367 (11th Cir. 1997) ("Facial challenges to the legal sufficiency of a claim or defense, such as a motion to dismiss based on failure to state a claim for relief, should … be resolved before discovery begins. Such a dispute presents a purely legal question; there are no issues of fact because the allegations contained in the pleading are presumed to be true."). Accordingly, the Court will deny plaintiff's motion for discovery and proceed to assess defendants' Motions to Dismiss, which question the sufficiency of the allegations in the complaint. Cf. Jones-el v. Wright, No. 2:16cv502, 2018 WL 9811697, at *3 (E.D. Va. Feb. 2, 2018) (denying plaintiff's request to postpone consideration of defendants' motion to dismiss pending discovery, stating that a court reviewing a motion to dismiss must only

"review the allegations in the complaint to determine whether they are sufficient to state a plausible claim for relief," a process for which discovery is not necessary).

## II. Motions to Dismiss

### A. The Complaint

The complaint contains the following factual allegations. On May 26, 2020, the National Guard conducted COVID-19 tests on the inmate population at SFEU, of which plaintiff was a member. [Dkt. No. 1] at 10. The results of the tests were not distributed to inmates but, "according to institutional rumor," very few prisoners tested positive. Id. In late May or early June of 2020, a correctional officer who worked on the floor where plaintiff was housed "went on medical leave due to a positive result for COVID-19." Id. "Without first submitting him to double negative results," defendants required the officer to return to work. Id. The officer was "visibly ill and … still suffered flu-like symptoms" upon his return. Id. Shortly thereafter, "numerous offenders became ill and the 2nd floor … was lockdowned [sic] and subjected to COVID-19 testing." Id. According to the complaint, "at least half of the [tested] offenders," including plaintiff, who also suffers from "supraventricular tachycardia," tested positive. Id.

Plaintiff was not promptly informed that he had tested positive for COVID-19. Id. He developed several symptoms of the disease, including "respiratory distress, fever, severe body aches," and more, and thus "repeatedly requested [his] test results." Id. at 11. Despite plaintiff's symptoms, defendants "never provided [him] any treatment." Id. Instead, defendants addressed the institutional outbreak by "separat[ing] the positive cases on one side of the hall and the negative cases on the other side, [eighteen feet] away." Id. Large fans circulated air in the space, and officers passed out ice water from one side to the other, all of which, according to the complaint, "created an atmosphere of cross contamination." Id.

The complaint additionally alleges that COVID testing ceased after June 18, 2020, that SFEU's clothes washers and driers consistently malfunction, that inmates are released from quarantine without being tested for sickness, and that inmates and staff are routinely moved to and from different floors and buildings within the institution. Id. at 14-15. According to the complaint, these actions violate the terms of a March 2020 executive order issued by Governor Ralph Northam as well as a May 2020 settlement agreement entered in Whorley v. Northam, No. 3:20cv255 (E.D. Va. 2020), a class action lawsuit alleging that the Commonwealth of Virginia violated the Constitution by offering an inadequate response to the COVID-19 pandemic within its correctional facilities. [Dkt. No. 1] at 9. Defendant Meyer was a named defendant in Whorley.[2] Id.

### B.     Standard of Review

A motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure tests the sufficiency of a complaint; it does not resolve contests surrounding facts, the merits of a claim, or the applicability of defenses. Republican Party of N.C. v. Martin, 980 F.2d 943, 952 (4th Cir. 1992). To survive a 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A claim is facially plausible if "the factual content of a complaint allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Nemer Chevrolet, Ltd. v. Consumeraffairs.com Inc., 591 F.3d 250, 256 (4th Cir. 2009) (quoting Iqbal, 556 U.S. at 678). A complaint must therefore allege specific facts in support of each element of each claim a plaintiff

---

[2] The complaint alleges that each named defendant, with the exception of Watford, was a party in Whorley. [Dkt. No. 1] at 9. Although in the context of a motion to dismiss a court is typically constrained to accept a complaint's allegations as true, this is not the case when an allegation is disproven by sources subject to judicial notice, see Veney v. Wyche, 293 F.3d 726, 730 (4th Cir. 2002), as is the case here. Indeed, a review of the docket in Whorley shows that the only individual named both there and here is Thomas Meyer. See Whorley v. Northam, Case No. 3:20cv255 (HEH/DJN).

raises; "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," do not suffice. Iqbal, 566 U.S. at 678.

**III. Analysis**

The complaint explicitly identifies two potential grounds for relief, each rooted in the Eighth Amendment. It claims first that defendants were deliberately indifferent with respect to the dangerous conditions of confinement plaintiff experienced at SFEU. [Dkt. No. 1] at 7. Second, it claims that defendants were deliberately indifferent to plaintiff's serious medical needs by failing to promptly notify him that he had tested positive for COVID-19. Id. The complaint also implies, without explicitly stating, that plaintiff is entitled to relief based on defendants' alleged violations of Governor Northam's March 2020 executive order and the terms of a settlement agreement entered in Whorley v. Northam, No. 3:20cv255 (E.D. Va. 2020). Neither plaintiff's explicit nor implicit claims warrant the provision of relief.

    **A.    Eighth Amendment Claims**

The Eighth Amendment of the United States Constitution prohibits the imposition of cruel and unusual punishments upon incarcerated individuals. See U.S. Const. amend. VIII. The Amendment also imposes duties on correctional officials to provide humane conditions of confinement and ensure that inmates receive adequate food, clothing, and medical attention. See Farmer v. Brennan, 511 U.S. 825, 832 (1994).

Every Eighth Amendment claim consists of two components, one objective, one subjective. Scinto v. Stansberry, 841 F.3d 219, 225 (4th Cir. 2016). To satisfy the first prong at the pleading stage, a complaint must allege that the plaintiff suffered a deprivation that was, objectively, "sufficiently serious." Id. "To be sufficiently serious, the deprivation must be extreme—meaning that it poses a serious or significant physical or emotional injury resulting from the challenged

conditions, or a substantial risk of serious harm resulting from . . . exposure to the challenged conditions." Id. (internal quotations omitted).  To satisfy the second prong, a complaint must allege that prison officials acted with "deliberate indifference" toward the challenged condition. Id.  "To prove deliberate indifference, plaintiffs must show that the official kn[ew] of and disregard[ed] an excessive risk to inmate health or safety." Id. (internal quotation omitted).

                i.      Conditions of Confinement

As an initial matter, defendants correctly note that the complaint does not attribute any specific acts or omissions to them and instead "refers to [Walrath, Meyer, Maurice, and Watford] collectively as defendants," nakedly blaming the group for the conditions present at SFEU. [Dkt. No. 22] at 2.  This alone warrants dismissal of this action. See Wilcox v. Brown, 877 F.3d 161, 170 (4th Cir. 2017) (explaining that liability will lie under § 1983 only "where it is affirmatively shown that the official charged acted personally" in the violation of the plaintiff's rights and affirming dismissal of claim where plaintiff did not allege personal involvement by defendant) (quoting Vinnedge v. Gibbs, 550 F.2d 926, 928 (4th Cir. 1977)); Potter v. Clark, 497 F.2d 1206, 1207 (7th Cir. 1974) ("Where a complaint alleges no specific act or conduct on the part of the defendant and the complaint is silent as to the defendant except for his name appearing in the caption, the complaint is properly dismissed, even under the liberal construction to be given pro se complaints.").

Plaintiff attempts to counter this argument by claiming that defendants "are directly responsible for all decisions regarding the daily operations" at SFEU and thus may be held liable for the facility's conditions. [Dkt. No. 25] at 2.  But this counterargument does not salvage the complaint because, as just stated, liability under § 1983 is "personal, [and] based upon each

defendant's own constitutional violations," not merely the defendant's title or role. Trulock v. Freeh, 275 F.3d 391, 402 (4th Cir. 2001) (internal citation omitted).

Although it is true that supervisory prison officials like defendants can be held liable for constitutional injuries inflicted by their subordinates, this is so only to the extent that the supervisors' omissions were themselves "causative factor[s] in the constitutional injuries . . . inflict[ed] on those committed to their care." See Shaw v. Stroud, 13 F.3d 791, 798 (4th Cir. 1994). In sum, to state a supervisory liability claim, a complaint must allege facts that demonstrate that (1) the supervisor-defendant knew his or her subordinate "was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury," (2) the supervisor's response showed "deliberate indifference to or tacit authorization of the alleged offensive practices," and (3) there was an "affirmative causal link" between the supervisor's inaction and the constitutional injury suffered by the plaintiff. Id. at 799 (cleaned up).

The complaint does not contain factual allegations supportive of these elements. Although the complaint (incorrectly) alleges that three of the four defendants were parties in Whorley and thus allows for an inference that those defendants were aware of the dangers of COVID-19 in prisons, there are no allegations to support the notion that defendants' subordinates were engaged in conduct that risked constitutional injury to plaintiff; as previously discussed, the complaint does not specifically assign blame to any individual for any of the conditions it describes.

Nor does the complaint offer facts to demonstrate that defendants were indifferent to the risk of COVID-19 or "tacitly authorized" insufficient responses to the pandemic. Instead, accepting as true plaintiff's supposition that defendants were "directly responsible" for the decisions dictating the conditions at SFEU, the Court finds that the complaint concedes defendants took—or at least oversaw—several actions to lower the risk of transmission of COVID-19,

7

including by locking down plaintiff's floor upon news that offenders had become ill, by "separat[ing] the positive cases on one side of the hall and the negative cases on the other side," and by installing "large fans [to] circulate[] the air." [Dkt. No. 1] at 11. By the complaint's own admission, then, officials at SFEU did not "know of and disregard an excessive risk to inmate health or safety." Scinto, 841 F.3d at 225.

A number of courts have found measures similar to those taken by defendants to constitute reasonable responses to COVID-19 outbreaks within correctional institutions. See, e.g. Stevens v. Carr, No. 20-C-1735, 2021 WL 39542, at *4-5 (E.D. Wisc. Jan. 5, 2021) (identifying a prison's use of "fans running on high to circulate the air" as part of a reasonable response to mitigate the risk of COVID-19); Wilson v. Williams, 961 F.3d 829, 841 (6th Cir. 2020) (highlighting the decision to "isolate[e] and quarantine[e] inmates who may have contracted the virus" as part of a reasonable response to the risk posed by COVID-19).

To the extent plaintiff argues that the measures taken at SFEU were insufficient to fully mitigate the risk of COVID-19, he misunderstands the requirements of the Eighth Amendment. A defendant's response to any given hazard need not be perfect to insulate the defendant from constitutional liability. Indeed, a court reviewing a claim that a defendant violated the Eighth Amendment through his response to a dangerous condition does not ask "whether [the defendant's] efforts ultimately averted the risk," Stevens, 2021 WL 39542, at *4, but whether the defendant "responded reasonably to the risk," Farmer v. Brennan, 511 U.S. 825, 843 (1994). Accordingly, the complaint's allegation that plaintiff and other SFEU inmates contracted COVID-19 and suffered from its symptoms is insufficient, standing alone, to support a viable Eighth Amendment claim.

8

On this basis, it is clear that the complaint does not support an Eighth Amendment claim—whether predicated on a theory of supervisory liability or on defendants' personal acts or omissions—based on the conditions of confinement at SFEU.

### ii. Failure to Inform of Diagnosis or Treat Symptoms

The complaint's allegations that institutional staff failed to timely inform plaintiff of his COVID-19 diagnosis equally fail to support a viable Eighth Amendment claim. Indeed, the only individuals named as defendants in this action are members of SFEU's administrative staff, not medical professionals, and "to establish [an Eighth Amendment claim for mishandled medical care] against non-medical prison personnel, a plaintiff must demonstrate that the official was personally involved in the treatment or denial of treatment, [] that they deliberately interfered with the treatment, or that they tacitly authorized or were indifferent to the medical provider's misconduct." Ballenger v. Crawford, No. 3:15cv12558, 2016 WL 8710023, at *9 (S.D.W. Va. Aug. 5, 2016) (citing Miltier v. Beorn, 896 F.2d 848, 854 (4th Cir. 1990)).

Here, the complaint contains no such allegations. It does not allege, for instance, that defendants were personally responsible for collecting and processing COVID-19 tests and failed to do so. Nor does it allege that defendants had any contact whatsoever with the medical personnel who truly were responsible for those duties, let alone that defendants interfered with or were indifferent to medical personnel's failures to uphold their responsibilities.

In short, although it is possible that plaintiff may possess a viable Eighth Amendment claim against SFEU's medical staff for its alleged failure to inform him of his positive COVID-19 test result, no medical staff members are named as defendants in the complaint. Absent allegations that the named defendants interfered with or were personally responsible for plaintiff's medical

9

care, the complaint fails to state a claim against them with respect to the treatment or diagnoses plaintiff received or failed to receive while in custody.[3]

### B. Claims Based on Violations of Executive Order and Settlement Agreements

Finally at issue are plaintiff's arguments that defendants violated the terms of a March 2020 state executive order regarding COVID-19 as well as the terms of a settlement agreement entered in Whorley. As stated above, the complaint does not explicitly identify these arguments as grounds for relief, [see Dkt. No. 1 at 7], but a deferential reading of the complaint indicates that plaintiff may have intended to raise them.

The Court has searched for and located every executive order issued by Governor Ralph Northam in March 2020.[4] Although plaintiff does not identify which specific order he feels defendants have flouted, it appears to the Court that he invokes Executive Order 55, which was signed March 30, 2020.[5] As plaintiff correctly notes, the document prohibited "public and private in-person gatherings of more than ten individuals;" however, the document also carved out many exceptions to that general rule. Most relevantly, the order made clear that it imposed no restrictions on "law enforcement agencies [] or [] the operation of government." The Virginia Department of

---

[3] Plaintiff also argues in passing that he was entitled to know about his test results and that defendants' failure to promptly inform him violated Virginia Department of Corrections Operating Procedure 720.1. [Dkt. No. 1] at 16. Even assuming defendants were personally involved in the failure to provide plaintiff this information—something the complaint does not support through factual allegations—their failure would not support the imposition of constitutional liability on this basis because a failure to abide by a state's procedural regulations is not, standing alone, actionable under § 1983. See Riccio v. Cty. of Fairfax, 907 F.2d 1459, 1469 (4th Cir. 1990) (holding that state's failure to abide by its own procedural regulations is not a federal due process issue); Edwards v. Johnson, 209 F.3d 772, 779 (5th Cir. 2000) (holding that alleged violation of prison's visitation policy provides no basis for constitutional claim).

[4] See VIRGINIA GOVERNOR RALPH S. NORTHAM, https://www.governor.virginia.gov/executive-actions/ (last accessed Nov. 22, 2021). The court takes judicial notice of the executive orders as matters of public record. See Philips v. Pitt Cty. Mem'l Hosp., 572 F.3d 176, 180 (4th Cir. 2009) (court may "properly take judicial notice of matters of public record"); Fed. R. Evid. 201(b).

[5] See TEMPORARY STAY AT HOME ORDER DUE TO NOVEL CORONAVIRUS (COVID-19), HTTPS://www.governor.virginia.gov/media/governorvirginiagov/executive-actions/EO-55-Temporary-Stay-at-Home-Order-Due-to-Novel-Coronavirus-(COVID-19).pdf (last accessed Nov. 22, 2021).

Corrections—and therefore SFEU—undeniably fits both of these descriptions, and the Court thus dismisses out of hand plaintiff's argument that defendants have violated Executive Order 55 by failing to limit the SFEU population to less than ten individuals.

Nor has plaintiff convinced the Court that defendants' alleged violations of the settlement agreement in <u>Whorley</u> are actionable through this lawsuit.  Although plaintiff is correct that the initial private agreement in <u>Whorley</u> imposed a host of requirements upon the parties to the suit—some of which the complaint alleges were not followed at SFEU—that agreement has since been superseded by a second private settlement that explicitly terminates federal judicial oversight of the agreement.  See <u>Whorley v. Northam</u>, No. 3:20cv255 (E.D. Va. 2020), [Dkt. No. 93-1].  The Supreme Court has stated that a federal district court is empowered to oversee disputes with regard to settlement agreements "if the parties agree" that the federal court will retain jurisdiction; where the parties do not agree, "enforcement of [a] settlement agreement is [a question of contract law] for state courts, unless there is some independent basis for federal jurisdiction."  <u>Kokkonen v. Guardian Life Ins. Co. of America</u>, 511 U.S. 375, 381-82 (1994).

**IV.   Conclusion**

For the reasons stated above, defendants' motions to dismiss will be granted through an Order that will accompany this Memorandum Opinion.

/s/
Michael S. Nachmanoff
United States District Judge

December 10, 2021
Alexandria, Virginia